Case No. 24-1049, Vanda Pharmaceuticals, Inc. Petitioner v. United States Food and Drug Administration, et al. Mr. Hughes for the petitioner, Mr. Yelling for the respondents. Good morning, Mr. Hughes. Good morning, Your Honor, and may it please the Court, Paul Hughes for Vanda Pharmaceuticals. I'd like to start with why we're here. FDA has sought to arrogate to itself control over drug development. FDA has decided that it itself will determine which new drug indications are appropriate. And FDA has escalated the standard of evidence for drug approval far beyond what Congress intended, in part by refusing to objectively evaluate the scientific evidence that applicants submit. Now, Vanda is a pharmaceutical innovator, and it has suffered immensely. It has spent tens of millions of dollars to develop a novel treatment for jet lag. The evidence, in our view, is overwhelming that Hetlios works to treat this condition. People fall asleep far faster and stay asleep far longer than FDA requires for all other sleep medications. But that's just a sleep disorder, isn't it? There's a difference between a sleep disorder and jet lag disorder, isn't there? Well, yes, Your Honor. There are, you know, 18 approved medications for a variety of sleep disorders. Jet lag is one kind of sleep disorder. And our evidence is that this works, you know, essentially better than any product that's been approved for all the other forms of sleep disorders. But ultimately, we think this case doesn't require the Court to make a determination as to this drug is necessarily approvable. We think where FDA absolutely went wrong was denying Vanda a hearing. The evidence to us is quite clear that there are a multitude of disputes of facts. So everything that's in Part 2 of our brief, both our opening brief and our reply brief, illustrate the broad variety of true disputes that exist in this case. And because of those disputes, our principal submission to the Court was that essentially the grant of summary judgment, the denial of a hearing, was improper. So we don't think the Court needs to wade into the various disputes because those actually deserve a hearing where there will be a testimony by our experts, testimony by FDA's experts, and there can be a contested proceeding in order for FDA to fairly evaluate all of that evidence in the process that Congress created. Doesn't that just boil down to your subjective sleep measures, which were not specified? That's kind of like, once I kind of dug down through it all, it seemed that that's kind of the main issue there. So, Your Honor, FDA's principal contention is that because their submission is that we don't have evidence of efficacy as to next day functioning, what they call a Criterion B, that they can grant summary judgment. There are three independent problems with that. First is the sleep experts show that you don't actually have to treat Criterion B symptoms in order to get approval. The 18 drugs that I mentioned, as Dr. Roth explained, none of them, except for one only for half of its indication, actually has a Criterion B indication, and Dr. Roth explains why you don't need Criterion B indications. So if we could just dig down on that for a minute, because my understanding of your argument is that the FDA says we treat essential features, we don't look at the criterion, we're looking at essential features happens to include a Criterion B criterion, if I can finish, which is impairing next day function. You're saying there are all these other drugs or other disorders that have essential features that include Criterion B, and drug companies haven't been required to address the Criterion B symptoms. But when I actually look what's in the record of the disorders of insomnia that you point to, they don't include Criterion B features. So chronic insomnia disorder has a single essential feature. It's frequent and persistent difficulty initiating or maintaining sleep that results in general sleep dissatisfaction. That's the essential feature. There's no Criterion B in that. It goes on to say the sleep complaint is accompanied by distress, poor sleep. Those are Criterion B things, but that's not an essential feature. That's just something that accompanies the essential feature. So if I can finish, likewise, short-term insomnia disorder, same thing. There's a singular essential feature and it's accompanied by Criterion B features. So I don't think this record supports your argument that the FDA is being inconsistent when it talks about essential features, because essential features can include A, can include B, can include D. For jet lag disorder, it happens to include B, and there are plenty of other ones where they don't include B. I just don't think this record supports your argument. So let me address this in a multitude of ways. So first, I have two independent arguments, even if the court rejects me on that, that show why we've actually proven next-day functioning. So even if we have to, we have a dispute of fact as to whether we've proven next-day functioning. We also have a dispute as to whether or not a narrowing of the indication would solve that. That's my point one. I want to come around to that. So I'll get to the court's question. The point two, before I get directly to the court's question, is our principal contention is that what actually qualifies as jet lag disorder is a scientific issue. It's not an FDA regulatory issue. This is decided by sleep medicine experts, some of which may reside at FDA, but not all of which. The ICSD by sleep experts? Are you disputing that the ICSD is an appropriate source? Yeah. And let's talk about the ICSD. So if the court looks to joint appendix page 2088, this is the ICSD listing. And so this is the description of chronic insomnia disorder. And as the court noted, diagnostic criteria B includes, for example, fatigue and malaise. And there are nine of them, and that's at joint appendix page 2085 to 2086. Then at page 2087 is where the ICSD begins discussing its description of essential features. And if we turn the page to 2088, this is all in the description of essential features. It describes everything that is contained under criterion B. No, I don't think so. I think just because there's a section of the document that says specifically says, as I said, for chronic insomnia disorder, the essential feature, one feature is, and it's one sentence. But there's a whole description. This is under the heading. So at 2087, there's the heading essential features. And then at 2008... No, I understand the heading says essential features, but you have to read that section. And within it, there's a sentence that identifies what the real essential feature is. But then if you turn to the page 2089, it describes associated features. What we think, and this is what Dr. Roth, I believe, describes, is that what is contained under the heading essential features are the essential features of the disorder. It's not just one single sentence. I don't think we can not read that particular provision. We are... And what the sentences say, which don't support your... Yeah, the heading says essential features, and it has multiple paragraphs that describe essential features and has a second description of what associated features are. It's interesting you have to read the section. Because the heading says essential features doesn't mean everything that's in that is an essential feature. And I think this is an interesting dispute, which is exactly the kind of thing that goes to a hearing, because you can have sleep experts... I think not, because I think it shows that you haven't met your burden to establish that there's any problem with the way the FDA handled this. But again, as I said, this argument is sort of one of multiple independent arguments that we present. So even if the court... I can't convince the court that everything that's under essential features is actually features, as distinct from associated features, which is separately spelled out by the ICSD, which is how Dr. Roth, our sleep expert, says one trained in sleep medicine would understand this, which shows that there's a distinction between insomnia. I think that's pretty powerful, and I think that on its face deserves a hearing. But even if the court disagrees with that submission, I appreciate not to convince your honor, we have lots of evidence that even show we do show next day functioning. This is with the KSS and the VAS scales. Sure. So on the KSS and the VAS and the other associated evidence of next day functioning, we think there is a tremendous wealth of evidence that exists in the record demonstrating how individuals report that they have substantially improved next day functioning as a result of taking this drug. I think what FDA is... What about the pre-specification? Yeah. So your honor, there are two problems with the FDA's pre-specification analysis. The most important that I'll point the court to that FDA has essentially no response to is we provided an expert declaration from Dr. Platt, which did an analysis showing in this context that what you're trying to control for with pre-specification is what's called type one error. That's the result of a potential false positive. So as FDA's analysis points out, they're not wrong in an abstract matter that you do pre-specification so as to avoid doing a post hoc analysis and finding data that points to a conclusion but has a false positive risk associated with it. That's the general theory. So I don't disagree in the general abstract. That is one thing that one considers. What Dr. Platt did though is he said, let's look at the actual risk of type one error in the facts of this case using all the evidence before us. This is at page 2,299 of the record where Dr. Platt has his conclusions and he says there are 22 separate endpoints that have been shown throughout all of the studies. He did a meta-analysis and he said all 22 endpoints show directional improvement. And so in that context where everything shows that this product works, the risk of there being type one error is negligible and he said there's no material risk. Isn't one of the things that the FDA said about Platt's declaration was that essentially what you did was take your answer to each individual study suffers the same flaw was to do a meta-analysis of all the studies with the same flaw and that can't fix the flaw. It's just now intrinsic embedded into your meta-analysis. That's what they said and frankly that's an absurd position because the whole point of Dr. Platt who's an expert in statistics is to say I know what you're trying to control for as a general matter is type one error and the reasons that you have pre-specification but I can look in the context of this particular case use scientific methods and explain why what it is you're trying to control for and type one error does not exist in the context of the evidence that we have before us. So sure if you look at an abstract theoretic matter is is that pre-specification have some value yes but the question is what does it do in the context of this evidence before us and Dr. Platt says essentially nothing and FDA has no response to that other than to say well it is also post hoc but the absurdity point of that is he's describing from an expert perspective why the post hoc feature of this is not actually a problem and FDA doesn't respond to that with any substantive analysis they just essentially say no. Give you a hypothetical like I'm not an expert in I guess statistics or you know what's the best way to do a study but it seems to me that what is at stake here what's in play is just a sort of a methodological accepted practice which you should pre-specify to avoid a certain type of error. So if we had for example a sample usually I think you need to have 30 or more for a sample and Vanna came up well we have a sample of five and the criticism was well that's not a big enough sample and Vanna got an expert that said well usually you need a sample of 30 but in this case it was just so convincing that you should accept our sample of five. Would the FDA not be able to be like we don't accept your methodology because on its face that's not. So what American sign amid this court's case I think addresses that which says if you have a dispute of fact that is quote-unquote palpably shallow then a palpably shallow dispute of fact is not something that entitles one to a hearing. We don't think these disputes of fact are remotely to the range of being palpably shallow and though to get to the particulars of this. But my what about my hypothetical because that seems to be similar to what you're saying here. There's a methodology that's accepted we didn't follow it but we have an expert that says it doesn't matter and what about my sampling? Would you have to have a hearing on that if you only had a sample of five? I think the question is is there a finding that that analysis is essentially palpably shallow and there's no meaningful dispute around it. And if one can draw that conclusion at the summary judgment standard it's not distinct I don't think from how the court looks at summary judgment saying there's no actual essential factual dispute here then the hearing would not be required. But in circumstances where there is a dispute and here we have a pretty expert statistician who's explaining why there isn't a risk of type one error in this context and we're not here FDA has no actual technical or meaningful argument they just have an attorney argument saying it has you know it's post hoc but the whole point of the analysis is to explain why not all post hoc analysis is bad. And this kind of goes to the broader problem here is FDA can always say run another test with another kind of pre-specification. You can always do more and more to try to eliminate what's called type one error but the problem that you have is you lead to a graveyard of unapproved drugs because you lead to type two error which is you have false negatives if you make the standard too demanding you have products that actually work which is this product that don't get to approval. So there has to be a balance between trying to control for type one and type two error and again I'm not saying this court strikes that balance I'm saying you have a hearing to strike that balance. Can I just go back to the one of your other other arguments is that your evidence does show the type of improvement in next day functioning that FDA is asking for. Yes. And am I right that that the main evidence you're referring to is the the KSS and the VAS metrics? Yeah there are other pieces of evidence but those are the two principles. But aside the questionnaires and all that but those are the two principles. Right and so my understanding of what FDA said is you you may have evidence that those are measures of sleepiness versus alerts and you might have it might be true that if you say you're sleepy that will correlate with next day functioning but those don't capture the situation where somebody feels alert but is still impaired in their functioning on the next day which FDA says their definition is that that's the key sort of independent feature of jet lag disorder. You could separate from sleep disturbance because of the circadian rhythm change you're going to have next day functioning problems. Do you have evidence that goes to that kind of well that's what Dr. Roth tells us is that KSS in the sleep medicine world is sort of the gold standard for figuring out how somebody is performing on the next day is looking at the KSS standard. It is do you feel in the sleep medicine world not in a circadian rhythm you've traveled to the other side of the and I don't fully understand this but the FDA says and the ICSD says separate even if you're sleeping totally fine the fact that your circadian clock is so off is going to impair your functioning. That's an essential feature of jet lag and I don't think Roth speaks to that. No no what Roth says is the way that you get at that question about next day functioning is you do these surveys of people and you ask them how are you functioning, what is your alertness versus your sleepiness level because that is what is directly tied to your functioning on a particular day is how somebody's doing compared against their baseline. So it's not the evidence that goes to criterion A is you fall asleep faster and you sleep longer. Those are objective scientific facts. The next question about if we get to criterion B if that's even required and again we have a disagreement about that but if it's required then the question is well what's a way that you show your next day functioning you learn from people what their objective or what their how they experience their performance what their alertness versus sleepiness is that next day and I think you're equating performance to alertness for sleepiness and here's just one one way of many that FDA made this point I just want to know what your response is. So they say quote the scale would not capture the impairment of someone who felt subjectively alert but performed poorly behind the wheel of a car. So this this goes to the key problem is FDA can always come up with some other test of oh put somebody behind a wheel of a car but nothing in criterion B says put somebody behind the wheel of a car. It's just an example right the whole the fundamental point is you could have somebody who does not feel sleepy feels very alert but is functionally impaired and that you didn't measure for do any study that goes to that at least that's my understanding. That that's wrong your honor because the alertness study is actually is the person functioning that is that is directly tied that's what the evidence shows is is if the person is alert they are have that that degree of of functioning but again these are not questions that I think this court needs to be deciding these are questions that are scientific expert questions about people who actually spend their life doing sleep medicine and now maybe FDA disagrees with Dr. Ross explanation of what KSS and VAS show and how demonstrate next day functioning and that's that's a fine dispute for us to have on a full factual record where FDA produces what it is that they believe is the evidence that contradicts our evidence but right now we don't have any evidence from the FDA we just have FDA rejecting our evidence and again the statutory standard to bring it back to is substantial evidence as FDA has said this is often a low standard we don't have to have overwhelming evidence of efficacy we don't have to every conceivable piece of evidence that FDA might wish we have the question is do we have substantial evidence of efficacy and again going back to the statutory standard what's critical is is there a qualified expert who fairly and responsibly concludes that we have demonstrated the effectiveness of our drug we've provided two experts to me that the implication of your argument is that any time a drug company has an expert that says there's a question of fact here the FDA has to hold a hearing because the standard says you know you have to have a substantial evidence but the practice is if there's no way you can meet that standard the FDA shouldn't have to waste its time holding a hearing but what you're saying is any time a drug company can get an expert to come in and say actually our opinion is there is a question of fact here the FDA has to hold a hearing so I have a few responses to that first there is a relief valve in the palpably shallow as American sign amid this court held so it is not in every case but second as a factual matter we describe in our brief there have been only five since 2018 and I think this stretches back at least a decade there have only been five requests for a hearing in all of FDA and FDA has denied a hearing in all five cases so we're not in a situation where FDA has a glut of hearing requests or a glut of hearings they deny all of them now that they never have hearings so far as I know no so drugs get approved without the approval happens without a hearing right that the approval happens with a lower level official issuing an approval letter without a hearing so there are no hearings on drug approvals essentially there are advisory committee proceedings that's the closest FDA comes but in my knowledge and we are we go back at least to 2018 there's not been any hearings before the seems like it's a sort of interactive almost collaborative process because just from reading this record it seemed like there was a lot of communication between Vanda and the FDA we want to do this FDA says well our concerns are this can you address this you go back and have studies you try to address concerns you come back so is that why and that there usually aren't hearings because usually it's more of a collaborative and less of an adversarial well I mean I'm not sure if we studied in this brief or else but you know the former general counsel of GSK was quoted as saying when FDA says jump if you're in the pharmaceutical industry you you ask how high that is how usually drug approval works so I I will agree with that that general approach but the point is Congress put into the statute a hearing mechanism for when there are actual disputes between the agency and uh the the the parties the applicants and you know I I think American sign amid is which is sort of to me a case that the government doesn't even cite in their brief uh it's a feature of our opening brief uh from this court the government doesn't even cite it if you look at the concluding paragraph of what this court held in American sign amid it is this case and so here's what this court said uh sign amid presented FDA with scientific studies which in the opinion of some experts prove that proban may be safely used by dog owners without professional supervision this was a about an animal product so that's our case we have scientific studies the opinion of experts sign amid's experts disputed FDA's interpretation and critiques of the study's uh results in methods so we dispute FDA's interpretation critiques of our sites that's exactly what our experts do they raise to a number of material questions about the appropriateness of the methodological standards the director attempted to graft onto the statute exactly what we're doing we're saying he's putting the FDA is putting additional standards onto the statute then last sentence in short the papers on file in this matter generate several material issues of fact and science that FDA attempted to resolve without a hearing in contravention of the food drug and cosmetic act that is our case you just in terms of what the standard is do you think it is it essentially the same standard we apply in summary judgment cases is there a material dispute of fact or is there some other more demanding feature i think it's a practical matter it's probably similar your honor to summary judgment standard what the american sign amid case said is if if a dispute i've said this a few times was palpably shallow uh then there would be no need for a hearing in those circumstances so it can't be a trivial dispute of fact or it can't be something that uh a court could say to me a material dispute that's that's right your honor so i i it's certainly a material dispute so you know i think i think palpably shallow material dispute is probably synonymous but uh yes so there there is in in fact to your honor's question it that every dispute automatically gets there there has to be a material dispute and we think our expert doubting is the government i didn't see it anywhere i just want to confirm they're not doubting that the your experts are indeed experts in the field is that right no that's not the least bit contested yes your honor so there's a joust between so-called experts in the government side and so-called experts on your side in your material disagreement to the matter and issue right yes your honor we don't know who the government's experts are at a hearing we'd like to cross-examine them and the government can cross-examine our experts we contest those disputes and we get a better process a fair process when those those experts get subject to a hearing and then fda adjudicates what the the the it views the the the correct result to be again what we ask the court for is is simply an application of american sign amid again when when i was preparing and read this course concluding paragraph it feels to me like that paragraph could be written for this case because we are in exactly the same circumstance i don't deny these are important disputes of of facts and we are not asking the court let me say the court does not need to resolve any of these it just needs to recognize that these are pretty weighty disputes that that warrant a scientific treatment thank you we'll give you two minutes for rebuttal thank you good morning your honors may it please the court i'm lewis yellen from the department of justice i'm here today on behalf of the fda i'd like to start with judge pan's observation about the collaborative nature of new drug and supplemental new drug applications and describe how the process usually works and what happened in this case let me let me let me let me go to the point that they're raising which is what's before us the statute says very clearly they're entitled to a hearing it doesn't say maybe it says they're entitled to a hearing american cyanide is a law of the circuit it is controlling precedent and as i read it and as i read other cases like it it seems very clear to me that disputes among experts on a scientific scientific question involving expert scientific judgment or material factual disputes i cannot comprehend in reading your brief and in reading the other side's arguments how you can possibly say they're not entitled to a hearing i don't know when but experts and you don't contest that they're experts experts disagree with the scientific judgments that have been offered by the agency these are factual disputes they are in lots of contexts of the law i really was kind of amazed at your arguments kind of like we exist and if we look at the record and we think we're going to end up ruling against you we don't have to have a hearing that's not the law that is absolutely not the law an american cyanide is the law of the circuit respectfully your honor so the law of the circuit is also pmrs and campanos and campanos and response specifically to american cyanide but to set that up um campano says if the fda has given adequate notice of the necessity of the necessary evidence it can determine without a hearing that there is not evidence in the record that could support their experts disagree with you about whether if i might finish let me let me yes your context their experts disagree with you about whether or not what's being proffered by is adequate to support the conclusion they reach you can't just say well no we're not going to accept it your honor have any regulation that forecloses them from offering the evidence that they're relying on and it's certainly not implausible i don't know who's right but there's certainly nothing implausible about it your honor as judge pan observed a little bit earlier if just because an expert says something doesn't mean that there's a genuine and substantial disagreement of fact an expert can make conclusory statements that are not supported either by reasoning or by studies i read these expert statements they're not conclusory they're going through what's before you and they're saying here's the way we analyze it and that's a dispute between experts this goes on all the time in the forensic science world goes on all the time competing experts disagree on how you assess the record and what's a viable conclusion in light of your assessments that's a factual dispute respectfully your honor is that a factual dispute no your honor it's not a factual no because the agency says no if i might respond your honor that the dispute here is about standards not about facts for example the dispute about whether the so-called subjective endpoints the kss and so forth produced statistically supportable studies is about whether or not you can have a study that does not pre-specify its uh its analytic methods and whether that can support robust findings from the study and they've answered they've answered your your contentions on that they've answered it in a way that is and then heard and then you make findings after you listen to both sides your honor i must say i didn't want to have to go through this but i did go through it and what they've said is not stupid or implausible these are really smart people in the field in which you're claiming to have expertise as well and they completely disagree with you on how you assess what's before us the statute seems absolutely clear they're entitled to a hearing you may win but they're entitled to a hearing respectfully your honor if an expert says one plus one equals three you're not entitled to a hearing and the the argument about one plus one equals three is discernibly wrong and your honor you're saying is not discernibly right you're saying we don't assess sleep disorder in that way another expert says no you can't assess sleep disorder in this way as distinguished from your way you are not discernibly right i don't know whether they're right there's a dispute between experts and what we do in the law and in the forensic science fields goes on all the time in the challenges under daubert this is what happens experts come together they disagree on how you assess the approaches the methodology the results and what they mean that's why you have hearings but your honor have the judge say in those kinds of cases i'm just deciding that i don't care what the experts your honor that's not entirely correct even in the delbert entirely correct even in the delbert setting there are circumstances where you don't get to a hearing because the experts have not the one plus one equals three right your honor and pre-specification is a basic method of statistical analysis it is so basic it is so fundamental that the fda's has guidance going back decades about the need for pre-specification in statistical research the medicine afraid of a hearing to make that point you're afraid they might come up with something i'm sorry we'll disprove your point i don't get it this the statute's so clear on their right to a hearing your honor and this court in campanos in pmrs in multiple opinions has recognized that unless there is a substantial and genuine issue of fact a hearing is not required if so long as the fda puts on notice the applicant of the sort of evidence that needs to be submitted if that evidence is not submitted and here there was not valid evidence submitted about treatment of impairment of next day functioning no hearing is required just go another level down on the pre-specification issue yes your honor my understanding is the problem with not pre-specifying is that there's a risk of false positives yes your honor that's exactly listed an expert a statistical expert to specifically address that issue and he concluded based on some kind of analysis contained in a an expert declaration that here there was no risk or a very negligible risk of false positives so and the response seems to be but you have to pre-specify to avoid false positive the actual specific uh uh response to his declaration in the cder reply gets very technical doesn't seem to say uh you didn't pre-specify regardless if they've shown they have someone saying there's no risk of false positives here why doesn't that create a fact dispute so the i'm sorry yeah the fda order incorporates the cedar um explanation rebuttal and one of the things was the failure to pre-specify perhaps we used to shorthand an explanation but the idea was the following if you do a meta-analysis is this in the record yes your honor i thought you said you used the shorthand it didn't explain this i was talking about our brief which i i believe judge garcia was referring to um so your honor at at 239 to 41 is um fda's uh discussion of the meta-analysis and the express adoption of the center's analysis which is at 224 49 253 the problem is if you do a meta-analysis of a bunch of studies that have inherent flaws within them those inherent flaws as judge pan i believe observed in the colloquy with mr hughes those inherent flaws are going to carry over to the meta-analysis um fda has explained that meta-analyses are useful when you have studies that pre-specify and themselves are analytically sound doing a meta-analysis that just carries over inherent statistical flaws is not going to be an answer to the inherent problem of the lack of statistical rigor in the underlying analyses i guess the point is the standard is not just does that seem reasonable to us it seems the standard is is there a dispute of fact in their entire expert declaration you're it's essentially saying that what plat did was totally useless because you just can't overcome the risk of false positives by doing this kind meta-analysis and his view obviously is you can that's why he did it right and you're disagreeing with so hard for us to say there's not a dispute isn't it um there's a dispute it's not a dispute of fact it's a dispute about statistical methodology and in simpson this court said said and i'm quoting explication of the proper method for evaluating statistical significance and that's the end of the quote is something to which this court defers to the fda the the sort of methodologies that are used is not the sort of question of fact that some summary judgment proceedings uh excuse me that hearings are meant to suss out um conceivably you can't be serious in that assertion if i might finish no no no no i want to stop in the middle of that assertion i was going to explain that assertion argument is between equally strong scientific people saying arguing over the methodology and you're saying if there's a dispute over whether a and b are viable that that is not something that raises the kind of factual dispute yes your honor it might raise a potential argument about arbitrary and capriciousness no no i'm putting it right to the summary judgment kind of i know you are your honor i'm trying to give you my response the fda's response which is if a applicant believes that the fda has an inappropriately adopted a statistical methodology they can bring an arbitrary and capricious claim about the agency's adoption of that methodology if the fda has a a methodology that says one plus one equals three the only claim i can make in challenging that is that it's arbitrary and capricious it may be arbitrary and capricious but in part because it's factually wrong your honor the analogy in this context is not the statement one plus one equals three it's what does the plus sign do it's an argument about you must use the methodology but whereby one plus one equals three that's the way we think about it no you're on i'm just giving you my example use our methodology one plus one equals three i can't challenge that as a factual matter no your honor it's not a factual challenge it's an arbitrary and capricious challenge and in fact in americans not assigned sorry cyanamide the court held that the agency had acted arbitrarily and capriciously it didn't say that the agency made an error of fact the problem in that case was that the agency adopted a methodology without giving fair notice to the applicant so i think mr hughes principal case supports the idea that arguments about methodologies are properly conceived of as challenges to whether or not the agency acted arbitrarily or capriciously they're not challenges about facts which are to be resolved in hearings i think i think most of us agree that your burden is high you have to show there's not even a dispute of material fact so we've talked a lot about this type one error issue the other ground on which it seems to me you could win is if there was just no dispute of fact that the sleepiness metrics the sleep versus alertness metrics speak to the type of next day functioning that is an aspect of jet lag disorder and i had some questions for mr hughes about that but um i guess i would just like to hear your your best argument on that issue yes your honor um your line of questioning did mirror implicitly the fda's understanding here which is um vanda failed to establish that metrics concerning degrees of actually correlate to degrees of functioning or or treatments for impaired functioning so the example your honor gave is a good one um individuals who report the same level of awakeness using the kss scale might not perform very well in a driving test for example and that's not the sort of inquiry that vanda undertook it just took the scales the degree of alertness scale to be a stand-in for the impaired functioning without any underlying analysis they have experts who say the kss standard is the gold metric well they do not have any studies or any underlying literature to show that the stat the standards that they use are themselves indicative of the impaired functioning that is associated with jet lag disorder so they do have so the combs declaration for example has a whole section showing saying that this measure of sleepiness is a way of assessing next day impairment and why i'd like to see how you'd put the response yes your honor um the fda specifically responded to that by saying those are assertions the citations that were made do not refer to any any studies or anything that shows that correlation the expert gave his opinion that there was a correlation here but without any supporting evidence and just and that is an example of the sort of conclusory evidence uh that was submitted along with vanda's um application the kind of thing it seems to me you're doing a hearing they bring in you say what you say they bring in what my colleague has mentioned and then if you think there's something that undercuts it you have an opportunity on cross examination or in presentation of your own case to show why what they're asserting is limited or no use i mean i must say in reading what they offer it certainly doesn't come across to me is implausible and unsupported that's what a hearing is for if i might i'd like to briefly um return to where i was starting which is to say the application process usually is an iterative process between the applicant and the agency disputes like the one that we have here are extraordinarily rare because the agency and the applicants agree on what has to be established in this case vanda identified the icsd standard as the standard for defining jet lag disorder fda accepted that understanding of jet lag disorder and i should pause to say essential features of that disorder are critical here because that's the fda agreed with vanda that that standard accurately captured what jet lag disorder is but you know whether something is an essential feature really comes out through this iterative process what has to be established to to gain approval of a drug despite the fact that vanda itself identified the icsd standard as the prevailing standard vanda supplied no valid evidence that there was actually an effect of its drug on next day function its principal studies concerned how well the drug allowed somebody to sleep the studies that addressed degrees of awakeness suffered from the two different problems that we've been discussing the statistic methodology flaw and the failure to correlate the degree of awakeness and other standards that they used with functioning so on the standard that vanda itself submitted to the fda as defining what uh jet lag disorder is vanda's evidence was insufficient and and just hope that evidence is insufficient that's what a hearing determined categorically your honor they failed to they said we have to they identified a standard that says you have to have x y and z they supplied evidence of x they did not supply evidence of y so on their own terms they failed to provide evidence that they acknowledged was necessary and to be uh just for the court's reference ja 2013 is a citation that shows that it's vanda that supplied this definition that uh the fda later accepted as the governing standard for this application if i could sort of try to frame this in a way that's easier for me to understand it seems like there are two levels of dispute here there's the level of the actual finding that needs to be made through a hearing which is whether or not there's evidence this drug does what it purports to do and those are the types of things like factual disputes that are suitable for hearing but before we even get to that level there's another level of dispute which is what kind of evidence can prove that and it seems that there is no dispute as to what the evidence of the methodology was we're talking about the methodology dispute not the actual factual disputes about the drug the methodology was we have kss we have these other ones they're subjective we did not pre-specify everybody agrees and the dispute on that level is whether that evidence is strong enough even to get you to a hearing because it seems to me the fda's view that if you don't pre-specify that data is not strong enough i guess what mr hughes would say shallow level dispute it's a very shallow level dispute because everybody knows through many decades of understanding of statistics and methodology that you have to pre-specify because if you don't your data is no good so we don't need to have a hearing about whether pre-specification is necessary or not that's not the type of factual dispute the hearing is for this here the factual disputes for the hearing are does the drug work or not but there's a threshold question about what evidence can be used to get you to a hearing and if you could explain like what is the if the fda is relying on just decades of experience you're saying that the fda gets some in terms of that kind of threshold level and i want to understand better like where does that difference come from and what is the fda relying on this case to say this is a dispute that's not even worth having a hearing yes your honor so uh in simpson the court um explained that fda is an expert scientific agency that that uses statistical analysis on a regular basis and as a general matter courts defer to the agency in the agency's views about what statistical methodologies are appropriate and necessary um i could also say just the summary judgment context or just generally i'm sorry your honor i don't recall the answer to that question i will say this however your honor um simpson also went on to say that um in that case the statistical flaw was also basic so basic to statistical analysis that difference wasn't even needed and the same is true here pre-specification is absolutely basic to getting robust analyses of data that are obtained um there are some references in our brief that identify some of the fda underlying fda guidances which discussed pre-specification it is a standard that has been around for absolute a methodology i should say that has been around for absolute decades and decades and it is so fundamental that a failure to pre-specify is sufficiently fundamental that there is no need to have a hearing about whether pre-specification is appropriate and or required here and on your alternative ground you said there are two reasons why it's not required one is the pre-specification problem the second is the one identified by judge garcia which is these studies don't even address the situation where there could be impaired next-day functioning um that's that a subjective person doesn't perceive a person expressing their subjective feelings doesn't perceive that's right is there any countervailing argument on that side or countervailing evidence that's been on that issue not that i am aware of not that the record indicates vanda's experts attesting stating that kss is the gold standard and provides sufficient evidence and awakeness is evidence of next day functioning but that is just an assertion that but that still just goes to awakeness as opposed to impaired functioning where you don't perceive that that's right there is no evidence in the record evidence the record that there's a dispute about whether their evidence can prove that you can have impaired next day functioning that's not related to your perceptions um there is no so i want to be careful here i think i'm quite certain that mr hughes will say there is such evidence the evidence he will point to is his is vanda's expert declarations stating that degree of awakeness is correlated with next day functioning the fda's determinations on that issue however was that there is no support for the experts assertions that the two correlates didn't rely on anything they cited data which the fda looked at and said this has nothing to do with what you have asserted this this does not respond to that yes your honor throughout the entire process absolutely your honor the experts ended up disagreeing right that's when you go to a hearing respectfully what they said you can shake your head all you want counsel i mean you know be respectful of the process i'm trying to understand what you're saying yes your honor and some of what you're saying sounds like gobbledygook because you say well they said x and they relied on y and they offered it and so i'm sitting here thinking well did they offer something that was showing validity and reliability and you want to summarily say no no meaning what what does that mean no that no one in their right mind could have looked at what they looked at and reached the conclusion they reached is that what you're saying it was scientifically unsupported yes that is what i'm saying okay i guess my only follow-up to that is is correlation the same as evidence of the actual thing that they need to prove is that uh again i need to be careful because these are statistical terms i i i don't know that coral whether correlation or some other standard would be the most appropriate here all i can say is there is no connecting fiber whatsoever that is whatever the standard is they didn't undertake tests for example to show that two people who report that seven on a kss scale have successful driving ability um given their report of seven or whether they instead in a simulated driving uh endeavor would get into accidents on a regular basis despite the fact that they indicated that they thought that they were very awake um there is no evidence of that sort there is just the assertion that this is an adequate stand-in for functioning i understand thank you any other questions thank you thank you your honors thank you your honor i'd just like to jump right to judge garcia's question if i could about the evidence that exists in the record showing daytime functioning i'd start by pointing the court to joint appendix page 249 this is dr ross first expert report and if i can read from it the visual analog scale vas has been used to measure sleep and wake function at clinical trials it is common within the sleep research community to use vas to and this is quoting measure aspects of sleep and daytime functioning and the effects of therapeutic interventions on them he cites to the zisip pulse uh published article that was published in 2003 which we attach as exhibit 180 that in turn cites to nicholson published in 1976 which we attach as exhibit 129 which in turn cites to parrot published 1978 which we attach as exhibit 132 uh then i'm sorry right this is the the key issue right that everything you said could be true alertness versus sleepiness correlates with your actual functioning that is sort of obvious and indisputable and the common example given is if you're sleepy you will drive worse it's like you know having drunk alcohol the key question is if someone thinks they are alert do they still function well which though is a different and more specific proposition am i making any sense well perhaps your honor but what i just read is dr ross saying if you are an expert in sleep medicine you want to know daytime functioning you look at the vas and he cites the three articles saying the vas tells you daytime functioning right and do any of those have anything to do with the travel related circadian rhythm difference that means even though you feel great i feel great but when i start writing my hand is shaking i don't i would still report on that study i feel alert well you're i guess i'm a little challenged in answering the question in kss we have five separate articles that connect the use of kss to jet lag particular but what dr roth is testifying here is that vas is if you're a sleep doctor and you want to know what is somebody's daytime functioning like are they actually functioning well during that day what you do is you administer a vas to them and you figure out what their daytime functioning is that's a it's a it's a methodological tool that you would use for insomnia you'd use for jet lag you use for a range of sleep conditions because it measures what somebody's functioning i think the key is whether you have studies that say this is validated for the specific type of functional impairment that's associated with jet lag with the circadian rhythm and so the best so when we look for that it's in ja249 let me give you a lot more so uh joint appendix 2022 yeah so so 249 is one place to start but dr ross second affidavit so this begins at page 2235 there is a heading that says vas is an appropriate patient reported measurement tool for next day impairment associated with jet lag disorder and then this continues for several pages it can be appropriate but it could be that it's not enough to check every part of the problem oh and that's an that's conclusion that fda could potentially reach in the course of a hearing we'll dispute that but well it's you you don't dispute that you have no evidence about the issue of next day functioning that you subjectively feel fine but in fact you are impaired no i we have loads of this that you have no evidence of that oh we have lots of evidence of this we have wait wait let's let's because it seems that all of your studies are these subjective asking people how do you feel studies what the evidence says is if you're a sleep doctor and you want to know what somebody's daytime functioning is this is what you do so i i hear your argument to be that we shouldn't have to do that because all the experts say all we do have to do is ask people what their subjective functioning is but if we accept the idea that the definition of the disease and to treat it you have to address these circadian rhythm things you know and one of these these things is you could subjectively say i feel fine but you could in fact be impaired none of your studies address that your studies do address there they are relevant they if how you feel is going to be correlated with how you function but they don't address the entire no i i i reject that premise i mean our studies show say if you're a sleep doctor and you want to figure out criterion b under icsd this is what you do we do what sleep doctors say you do to figure out criterion b we don't think there's those sleep doctors are were they talking about jet lag disorder or just general next day functioning after a bad night's sleep they're talking what you do this is what what dr ross analysis it starts on page 2235 it goes on for several pages he talks about the kas starting at joint appendix 2242 and it goes on for several pages he says and he cites many articles throughout it if you're an expert in the field and your job is to figure out i understand that so your argument is that if experts want to look at next day functioning they use this test but the issue is in this particular context which is jet lag disorder it says there's a circadian rhythm aspect that is not captured some of these other sleep disorder scenarios and in order to treat jet lag disorder you have to consider the circadian rhythm effects and just merely subjective relying on people's subjective statements of how they feel doesn't necessarily address that so i'm not saying that your argument is irrelevant i'm not saying that your argument i'm just saying like it doesn't capture the entire question about efficacy for this particular disorder that has an additional no definitely not because let's start with the things that that jet lag or sorry that hetlios is currently approved for is non-24 and smith-magenna syndrome those are circadian rhythm disorders fda agrees that i think we're really the only product that is approved to treat circadian rhythm disorders that's what makes this product different than all the others most products just turn off your brain and knock you out and that's why you have terrible next day functioning what hetlios does that's unique on the market is it entrains a person's circadian rhythm so that way their their brain if there's not having an external light source in the case of non-24 or people with blindness and smith-magenna syndrome chromosomal disorder in jet lag it's jet traveled induced phase shift we know this is product works for the circadian rhythm aspects of phase shift because we're the only product approved on the market to do it and fda has approved us for circadian rhythm disorders the the objection the fda has is not does it work for circadian rhythm disorder they've approved us for circadian rhythm disorders their new objection is well what is the effect what what how does somebody function uh uh next day because that's a criterion b and so to answer that we've gone to sleep specialists who say okay if you want to answer that you use vas and kss to get that data that's the data we have that's what the expert report says so i don't think there's a way to disentangle this for circadian rhythm is again we know our product works for circadian rhythm disorders fda can't dispute that uh the the studies address that like the studies that you rely on here well i mean there are a few things it's the mechanism of action so how this product works we know that the mechanism of action is one that goes to the receptors in the brain that relate to circadian rhythm disorders this is on the label that fda is approved with uh the the product so i mean it's known that this is a drug that affects circadian rhythm disorders so that's a sort of scientific background of how the mechanism of this product's action in fact works but i know i'm getting technical with the science what our request here for is for the court to apply american cyanamide cyanamide is this we don't think the court needs to address this we just i think are entitled to a hearing can you just remind me what the the best language in the second roth declaration is that you were referring to um yes your honor it follows under the heading vas is an appropriate patient reported uh measurement tool for next day impairment and he he gives uh quite a bit of evidence um that that that follows from there uh that that which page i'm on page uh 2235 and again i i think what i gave you at page 249 is pretty dispositive just to start there um i think that if you want one quote i think what i gave you at 249 is clearest where he says the sleep research community to use vas to quote unquote measure aspects of sleep and daytime functioning and the effects of therapeutic interventions on them and what he's saying is if you want to have measure therapeutic intervention and daytime functioning you use the vas and he's citing three peer-reviewed articles in order to make that argument and then in in the the page range between 2235 to 2242 he goes through kss and vas in more detail thank you thank you thank you
judges: Pan; Garcia; Edwards